15-2035-cr (L)
*United States v. Cummings*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————————

August Term, 2016

(Argued: December 14, 2016                    Decided: June 6, 2017)

Docket Nos. 15-2035-cr (L), 16-322 (Con)

———————————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

ARMANI CUMMINGS, AKA A1, CHRISTOPHER NWANKO, AKA Big Boi,

*Defendants-Appellants*.[1]

———————————————

Before: JACOBS, POOLER, and HALL, *Circuit Judges*.

Appeal from a judgment of conviction of the United States District Court

for the Southern District of New York (Marrero, *J.*) following a jury verdict

---

[1] The clerk of court is respectfully instructed to amend the caption as above.

convicting Defendant-Appellant Armani Cummings of one count of conspiracy to distribute 280 grams or more of cocaine base in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846; one count of using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c); two counts of killing a person during and in relation to a conspiracy to distribute 280 grams or more of cocaine base in violation of 21 U.S.C. § 848(e)(1)(A); two counts of brandishing and discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c); and two counts of causing the death of a person through the use of a firearm during and in relation to the crack cocaine conspiracy in violation of 18 U.S.C. § 924(j). Following Cummings's conviction, the district court sentenced Cummings principally to 75 years' imprisonment.

Cummings argues, among other things, that the district court erred by admitting hearsay evidence of a death threat he allegedly made against a government witness. We agree and hold that such error was not harmless. The hearsay was especially toxic because it created a grave risk that the jury would use it as evidence of Cummings's murderous propensity. That risk was heightened by the lack of a limiting instruction, the similarity between the death

threat and the underlying charges, the government's argument on summation suggesting that the threat was substantive proof of Cummings's guilt, and Cummings's inability to cross-examine the third-party declarant who heard his alleged threat. We therefore vacate Cummings's convictions and remand for a new trial.

On January 25, 2016, the United States District Court for the Southern District of New York (Marrero, *J.*) entered judgment against Defendant-Appellant Christopher Nwanko, convicting him, following a guilty plea, of one count of participation in a conspiracy to distribute 280 grams or more of cocaine base. On appeal, this Court appointed Nwanko new counsel pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A. Nwanko's counsel later filed a motion seeking permission to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967). We grant the *Anders* motion and issue an order simultaneously with this Opinion.

Vacated and remanded as to Cummings; *Anders* motion granted as to Nwanko.

_____

3

MARSHALL ARON MINTZ, Mintz & Oppenheim LLP, New York, NY, *for Defendant-Appellant Armani Cummings*.

MALVINA NATHANSON, New York, NY, *for Defendant-Appellant Christopher Nwanko.*

MICHAEL GERBER, Assistant United States Attorney (Hadassa Waxman, Margaret Garnett, Assistant United States Attorneys, *on the brief*), *for* Joon H. Kim, Acting United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

POOLER, *Circuit Judge*:

## BACKGROUND

Defendant-Appellant Armani Cummings appeals from a judgment of conviction of the United States District Court for the Southern District of New York (Marrero, *J.*) following a jury verdict. Cummings was convicted of one count of conspiracy to distribute 280 grams or more of cocaine base in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846; one count of using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c); two counts of killing a person during and in relation to a conspiracy to distribute 280 grams or more of cocaine base in violation of 21 U.S.C. § 848(e)(1)(A); two counts of brandishing and discharging a firearm during and

4

in relation to a crime of violence in violation of 18 U.S.C. § 924(c); and two counts of causing the death of a person through the use of a firearm during and in relation to the crack cocaine conspiracy in violation of 18 U.S.C. § 924(j). Following Cummings's conviction, the district court sentenced Cummings principally to 75 years' imprisonment.

Cummings argues, among other things, that the district court erred by admitting hearsay evidence of a death threat he allegedly made against a government witness. We agree and hold that such error was not harmless. The hearsay was especially toxic because it created a grave risk that the jury would use it as evidence of Cummings's murderous propensity. That risk was heightened by the lack of a limiting instruction, the similarity between the death threat and the underlying charges, the government's argument on summation suggesting that the threat was substantive proof of Cummings's guilt, and Cummings's inability to cross-examine the third-party declarant who heard his alleged threat. We therefore vacate Cummings's convictions and remand for a new trial.

On January 25, 2016, the United States District Court for the Southern District of New York (Marrero, *J.*) entered judgment against Defendant-Appellant Christopher Nwanko, convicting him, following a guilty plea, of one count of participation in a conspiracy to distribute 280 grams or more of cocaine base. On appeal, this Court appointed Nwanko new counsel pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A. Nwanko's counsel later filed a motion seeking permission to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967). We grant the *Anders* motion and issue an order simultaneously with this Opinion.

**I.    The Underlying Conduct**

The evidence presented at trial showed that, from 2006 to 2012, Cummings was a leader of a drug trafficking organization that sold crack cocaine in the Bronx. In that role, Cummings provided crack to street-level dealers, collected proceeds from their sales, and sold crack directly to end users on the street. Cummings and other members of his organization carried firearms in order to secure their drugs, proceeds, and territory.

By 2009, a building known as the Carter became a lucrative location for selling crack. Although a rival drug trafficking organization dominated the Carter's drug trade, Cummings and his organization competed for greater access to its spoils. In short order, that competition bred violence.

In particular, violence erupted between Cummings and Laquan Jones, a former member of Cummings's organization who, after a falling out, joined the rival organization and sold crack in the Carter. After several incidents between the feuding organizations—including one when Cummings chased Jones with a firearm, and another when Jones shot at Cummings while Cummings's mother was present—the competition over the Carter's drug trade turned deadly.

On January 14, 2010, Cummings shot and killed Jones. In retaliation, members of the rival organization shot and killed Travis Geathers, Cummings's close friend and a member of Cummings's organization. According to a member of the rival organization, Geathers's death was "a body for a body, nothing personal." Tr. at 477. Nevertheless, the violence persisted. On June 9, 2010, Cummings shot and killed Carl Copeland, a member of the rival organization who was allegedly tied to Geathers's murder.

## II. Indictments and Arraignment

On January 12, 2012, Cummings and thirty-four co-defendants were indicted for knowingly conspiring to violate federal narcotics laws and for related federal firearms violations.

On November 7, 2014, a superseding indictment was filed which charged Cummings with the following: one count of conspiracy to distribute 280 grams or more of cocaine base in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846; one count of using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c); two counts of killing a person during and in relation to a conspiracy to distribute 280 grams or more of cocaine base in violation of 21 U.S.C. § 848(e)(1)(A); two counts of brandishing and discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c); and two counts of causing the death of a person through the use of a firearm during and in relation to the crack cocaine conspiracy in violation of 18 U.S.C. § 924(j).

Cummings pled not guilty to all of the counts charged.

## III. Motions in Limine

8

On October 27, 2014, prior to Cummings's trial, the government filed a motion in limine regarding the admissibility of certain testimony from a cooperating witness, Jim Volcy. Volcy was a former crack dealer in the Bronx who claimed to have observed Cummings's participation in the Copeland shooting. Volcy also claimed to have heard Cummings threaten him while they were housed in the same prison.

In its motion, the government stated that it "intends to offer evidence that, while in jail, Cummings . . . threatened [a] cooperating witness[] . . . because of [his] cooperation." App'x at 55. In particular, the government proffered that "[Volcy] will testify that Cummings said that he would kill [Volcy] if he could because of [Volcy's] cooperation." App'x at 55. The government's motion in limine included no further factual information about this alleged death threat evidence as it pertained to Cummings.

The government argued that Volcy's death threat testimony was admissible under Federal Rule of Evidence 404(b)[2] as evidence demonstrating

---

[2] Federal Rule of Evidence 404(b) states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on

Cummings's consciousness of guilt, and that the probative value of that evidence outweighed any unfair prejudice under Federal Rule of Evidence 403.[3] Although the government acknowledged that the prejudice of this death threat testimony was "potentially significant," the government argued that any such prejudicial effect would be mitigated because the testimony involved only a verbal threat and did not involve conduct more sensational than the crimes charged. App'x at 56. The government added that any prejudicial effect associated with the death threat testimony "will be further eliminated by a limiting instruction." App'x at 56.

On November 3, 2014, Cummings's defense counsel opposed the government's motion in limine, arguing that the death threat testimony should be excluded under Rule 403, as the probative value of that evidence was far outweighed by the risk of unfair prejudice to Cummings. Defense counsel argued further that "if the Court permits such [death threat] evidence, Mr.

a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

[3] Federal Rule of Evidence 403 states that the district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

Cummings request[s] a limiting instruction, both at the time the testimony is admitted at trial and again during the Court's instructions to the jury at the end of trial." App'x at 65.

Several days later, the district court granted the government's motion and ruled that Volcy could testify about Cummings's alleged death threat. *See United States v. Cummings*, 60 F. Supp. 3d 434, 440 (S.D.N.Y. 2014). Specifically, the district court held:

> A defendant's threats toward a witness are admissible under Rule 404(b) as evidence of consciousness of guilt. . . . [T]he potential for unfair prejudice by presenting the threats at issue here is mitigated by the severity of the crimes alleged in the indictment. Certainly an allegation of a verbal death threat is no more inflammatory than an accusation of 'two premeditated, assassination-style murders.' The potential for prejudice could be further mitigated by a limiting instruction advising the jury that these threats are admissible only to show consciousness of guilt. The Court therefore grants the [g]overnment's motion with regard to evidence that Cummings . . . threatened [a] cooperating witness[], *subject to an appropriate limiting instruction*.

*Id.* (emphasis added) (internal citations omitted). The district court further stated that the government's motion was granted "subject to a limiting instruction directing the jury to consider the threats only to show consciousness of guilt." *Id.* at 441.

11

Cummings's defense counsel subsequently included a request in its proposed jury instructions relating to the admission of "similar acts" evidence. Proposed Jury Instructions on Behalf of Defendant Armani Cummings at 33, United States v. Cummings, No. 12-cr-00031, (S.D.N.Y. Oct. 17, 2014), ECF No. 927 [hereinafter "Proposed Jury Instructions"]. In particular, defense counsel asked the district court to instruct the jury as follows:

> The government has offered evidence tending to show that on different occasions the defendant engaged in criminal conduct which is not charged in this case.
>                               . . .
> [Y]ou may not consider this evidence as a substitute for proof that the defendant has committed the crime charged. Nor may you consider this evidence as proof that the defendant has a criminal propensity or bad character. The evidence of the uncharged act was admitted for a much more limited purpose, and you may consider it only for that limited purpose.

*Id.*

In its proposed instructions, the government omitted this request.

## IV. Trial

At trial, the government introduced testimony from a number of witnesses, including several former members of Cummings's drug trafficking organization, several former members of the rival drug trafficking organization,

12

and one of Cummings's former prison inmates. These witnesses testified that they observed Cummings sell crack, commit violence against members of the rival drug trafficking organization, and confess to murdering Jones and Copeland. The government also introduced 911 calls, as well as crime scene, ballistic, and medical evidence.

Volcy testified at trial. His testimony about Cummings's alleged death threat, however, deviated from the government's proffer in its motion in limine. Specifically, when presented at trial, Volcy's testimony posed potential hearsay issues that the government had not presented in its motion in limine.

After stating that he and Cummings were housed together at the Metropolitan Detention Center in Brooklyn ("MDC"), Volcy testified as follows:

| AUSA: | Now, at the MDC, did you see [Cummings]? |
|---|---|
| VOLCY: | Yes. |
| AUSA: | *Did he say anything to you?* |
| VOLCY: | *Not directly.* |
| AUSA: | *Did he say anything to you indirectly?* |
| DEFENSE: | Objection. |
| THE COURT: | Overruled. |
| VOLCY: | *He said stuff to people around me.* |
| AUSA: | But you were present? |
| DEFENSE: | Objection. Leading. |
| THE COURT: | Overruled. |
| AUSA: | What did he say? |

| | | |
|---|---|---|
| VOLCY: | He just called me rat bastard and just called me names -- things like that. |
| AUSA: | After he called you names, what if anything did he say to you or do to you? |
| VOLCY: | He didn't do anything to me. *He couldn't reach me*, but you know, he made threats, things like that. |
| AUSA: | What were the threats that he made? |
| VOLCY: | *He would shoot me in the face.* |

Tr. 933-34 (emphasis added). Although he made a pre-trial request for a limiting instruction upon admission of such death threat testimony, Cummings's defense counsel did not renew the request. The district court did not provide a limiting instruction at that time. It may be that the hearsay problem took the government itself by surprise. But it is nevertheless the case that neither the defendant nor the court was alerted to the problem in advance.

At the end of trial, during the charge conference, the government commented on a proposed jury instruction about evidence admitted under Rule 404(b). In particular, the government said, "I think, ultimately, in this case, I don't think that the government offered any 404(b) evidence. If I am wrong, the defense will correct me." Tr. 1728. Cummings's defense counsel responded that only a gun stipulation "might fall under this instruction." Tr. 1729. The

14

government disagreed, and therefore asked that the Rule 404(b) instruction be removed.

The next day, the government clarified its prior statement that there was no Rule 404(b) evidence offered in this case. The government stated:

> Yesterday during the charge conference, there was a question that came about whether there was any -- I think it was 404(b) evidence. And I wanted to correct that in one regard. . . . There was evidence that was offered with regard to consciousness of guilt; that is, certain threats that were made. And that's not a direct evidence, that's only consciousness of guilt evidence. I don't know if defense counsel wants an instruction with regard to that evidence or not, but I just wanted to flag that for the Court.

Tr. 1782-83. Cummings's defense counsel did not respond. On the other hand, the defense had already proposed a charge (set out *supra* at 12) that would alleviate the risk of propensity prejudice, and counsel might well have elected to avoid a more specific charge that would emphasize a vivid threat to kill a witness by gruesome means.

In delivering its jury instructions at the close of trial, however, the district court did not include the instruction regarding evidence admitted pursuant to Rule 404(b). Cummings's defense counsel did not raise an objection during the

15

charge conference or after the charge relating to the absence of a Rule 404(b) instruction.

Finally, in its summation, the government repeated Volcy's death threat testimony. The government stated, near the conclusion of its summation, "[n]ow, the importance of the cooperator testimony was not lost on Cummings[.] . . . You heard evidence that Cummings called . . . Jim Volcy, a 'rat bastard' and threatened to shoot [him] in the face for cooperating." Tr. 2161. After referring to this threat, the government added:

> You know why Cummings . . . made th[at] threat[]. You know why Cummings . . . did not want [Volcy] to testify. Cummings . . . knew that the testimony would be very, very damaging to [hi]m at trial.
> *And that testimony*, ladies and gentlemen, *was in fact completely devastating proof of [Cummings's] crimes*, proof that was corroborated again and again by the other witnesses and the other evidence in the case.

Tr. at 2162 (emphasis added).

On December 11, 2014, after a three-week trial, the jury convicted Cummings on all eight counts.

On January 16, 2015, Cummings filed a letter motion requesting a new trial pursuant to Federal Rule of Criminal Procedure 33 and renewed his prior

motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Fed. R. Crim. P. 29, 33. The district court denied those motions.

On June 19, 2015, the district court sentenced Cummings to 75 years' imprisonment. Cummings timely filed his appeal.

**DISCUSSION**

**I.      Standard of Review**

This Court reviews evidentiary rulings for abuse of discretion. *United States v. Natal*, 849 F.3d 530, 534 (2d Cir. 2017). "A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence or rendered a decision that cannot be located within the range of permissible decisions." *Id.*

Even if a district court abuses its discretion by making an erroneous evidentiary ruling, that error is ordinarily subject to harmless error analysis. *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009). "An erroneous ruling on the admissibility of evidence is harmless if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." *Id.*

Where, however, "the appellant fails to preserve an evidentiary challenge by lodging a timely objection, we review for plain error." *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 96 (2d Cir. 2014).

**II.      Did Cummings Forfeit His Claim of Error?**

Cummings argues that Volcy's death threat testimony constitutes inadmissible hearsay and the district court erred by admitting such testimony. As a threshold matter, the government contends that Cummings forfeited this argument because he raised it for the first time on appeal. We disagree with the government.

Under Federal Rule of Evidence 103, a party must make a timely and specific objection to an evidentiary ruling in order to preserve a claim for appeal. Fed. R. Evid. 103. In particular, Rule 103 states that "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and . . . if the ruling admits evidence, a party, on the record: (A) timely objects . . . and (B) *states the specific ground, unless it was apparent from the context*." Fed. R. Evid. 103(a)(1) (emphasis added); *see Robinson v. Shapiro*, 646 F.2d 734, 742 (2d Cir. 1981) ("The purpose of requiring a timely objection is to

18

identify the disputed issue and give the trial judge a chance to correct errors which might otherwise necessitate a new trial.").

Here, defense counsel timely objected to the relevant portion of Volcy's testimony. When the government asked Volcy whether Cummings said anything to him while they were at MDC, Volcy responded "not directly." Tr. 934. When the government asked a follow up question to clarify, "Did he say anything to you indirectly?", defense counsel objected. Tr. 934. The district court overruled the objection.

It is apparent from the context that defense counsel objected to the hearsay nature of Volcy's testimony, or at least the possibility that Volcy was testifying without personal knowledge of Cummings's threat. *See* Fed. R. Evid. 602 (stating that a lay witness "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"); *United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002). Given the context, defense counsel's timely objection was sufficient to identify the hearsay issue and give the district court the opportunity to correct any error that would result from admitting such testimony.

19

Therefore, we hold that Cummings preserved his objection to the admission of Volcy's hearsay testimony. Accordingly, as discussed above, we review Cummings's preserved evidentiary challenge to determine whether the court abused its discretion by admitting hearsay evidence, and if so, whether that error was harmless. *See Mercado*, 573 F.3d at 141.

## III. Admissibility of Hearsay Evidence

Cummings argues that Volcy's death threat testimony involved inadmissible hearsay and that the district court's failure to exclude such testimony was erroneous. We agree.

Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "Hearsay is admissible only if it falls within an enumerated exception." *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013); *see* Fed R. Evid. 802.

Cummings and the government dispute whether Volcy heard Cummings make the alleged death threat. According to Cummings, Volcy's testimony clearly indicates that Volcy did not hear Cummings's threat. *See* Appellant's Br.

20

at 28 ("[T]he entire exchange in question is prefaced by the admission that Cummings *never said anything to Volcy*, and Volcy never stated he was present when the 'threats' were made."). If Volcy did not hear Cummings make this threat, then Volcy must have heard about it from a third party. This proposition raises hearsay concerns.

According to the government, Volcy personally heard Cummings make the death threat and therefore Volcy could testify based on his first-hand knowledge. Specifically, the government claims that, in its appropriate context, Volcy's statement that Cummings "said stuff to people around me," Tr. 934, is "clearly understood to mean that Cummings made the statements to people *in Volcy's presence*." Appellee's Br. at 24 (emphasis added). Because the government asserts that Cummings's death threat was not offered for its truth—that Cummings actually would shoot Volcy in the face—but as evidence of Cummings's consciousness of guilt, the government concludes that Volcy's testimony does not raise hearsay concerns.

When reviewing evidentiary challenges in criminal cases, we view the evidence in the light most favorable to the government. *See United States v.*

*Curley*, 639 F.3d 50, 54 n.1 (2d Cir. 2011). Nevertheless, we only draw inferences that are supported by the evidence in the record.

Here, we cannot draw the government's preferred inference—that Volcy heard the death threat directly from Cummings—because it is not supported by the evidence in the record.

The plain language of Volcy's testimony belies the government's argument. When asked point blank whether Cummings said anything to him, Volcy said, "[n]ot directly." Tr. 934. When asked whether Cummings said anything to him indirectly, Volcy said that "[h]e said stuff to people around me." Tr. 934. The question is whether Volcy was present when the statement was made, and Volcy's statement that Cummings "couldn't reach [me]" suggests that Volcy and Cummings did not share a physical space, reducing the likelihood that Volcy heard Cummings make the death threat. Moreover, the government continued its testimony without allowing Volcy to answer the question, "But were you present?,"once the court overruled defense counsel's objection to the question as leading. Tr. 934. Lastly, Volcy's choice of language—a statement made "to people around me" rather than "directly"—bespeaks second-hand

22

communication. Taken together, the only inference supported by the evidence in the record is that Volcy did not hear the death threat directly from Cummings. Rather, the evidence supports an inference that Volcy heard about Cummings's threat from a third-party declarant.

As a result, Volcy's trial testimony presented a potential double hearsay problem, or hearsay within hearsay.

Under Federal Rule of Evidence 805, "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

Because Volcy did not hear Cummings's threat directly, Volcy's testimony involves two out-of-court statements, either or both of which poses hearsay concerns. The first statement is made by Cummings to a third-party declarant: "I am going to shoot Volcy in the face." The second statement is made by that unknown third-party declarant to Volcy: "I heard Cummings say 'I am going to shoot Volcy in the face.'" We review each statement to determine whether it is admissible, either because it is not hearsay or because it is hearsay subject to an enumerated exception, or whether it is inadmissible hearsay.

23

With respect to the first statement—made by Cummings to a third-party declarant, "I am going to shoot Volcy in the face"—it could be admitted as not hearsay on either of the following two possible bases. First, under Rule 801(c), a statement is not hearsay unless it is offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). The first statement would have been admissible if offered not for the truth of the matter asserted—that Cummings actually would shoot Volcy in the face—but rather as evidence of Cummings's consciousness of guilt. Second, under Rule 801(d), a statement is not hearsay if it is "offered against an opposing party and . . . was made by the party in an individual . . . capacity." Fed. R. Evid. 801(d)(2)(A); *see also Green v. City of N. Y.*, 465 F.3d 65, 77 (2d Cir. 2006). Thus, the district court could have also admitted Cummings's death threat as an opposing party's statement under Rule 801(d)(2) if the government sought to introduce the threat against Cummings, the opposing party in the prosecution, and if the third-party declarant that heard Cummings make the threat testified under oath.

Here, however, even though the first statement on its own could be admissible because it was not hearsay, we have to address the admissibility of

24

the second statement. In this case, the government did not call the third-party declarant to testify. As a result, the district court could only admit the death threat relayed in the first statement if the second statement in this double hearsay problem were admissible, either because it was not hearsay or because it was hearsay subject to an exception.

We hold, however, that the second statement—the third-party declarant's statement to Volcy that, "I heard Cummings say 'I am going to shoot Volcy in the face'"—was hearsay not subject to an exception. This statement is only probative if admitted for the truth of the matter asserted, i.e., that the third-party declarant *actually heard* Cummings make this threat. If it was not admitted for its truth, then it would not be probative of Cummings's consciousness of guilt. Because this second statement is offered for its truth and does not satisfy any of the enumerated hearsay exceptions, the second statement is inadmissible hearsay.

Accordingly, because the second statement is inadmissible hearsay not subject to an exception, Rule 805's requirement that "each part of the combined statement" be admissible is not met. The district court therefore abused its

25

discretion in admitting Volcy's hearsay testimony regarding Cummings's death threat.

**IV.     Harmless Error Analysis**

Having established that Cummings preserved his claim of error and that the district court abused its discretion in admitting hearsay testimony, we review that erroneous evidentiary ruling under a harmless error standard. *See* Fed. R. Crim. P. 52(a).

"An erroneous ruling on the admissibility of evidence is harmless if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." *Mercado*, 573 F.3d at 141. In order

> [t]o say that the erroneously admitted testimony did not
> substantially influence the jury[,] we are not required to conclude
> that it could not have had any effect whatsoever; the error is
> harmless if we can conclude that that testimony was unimportant in
> relation to everything else the jury considered on the issue in
> question, as revealed in the record.

*United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992) (internal quotation marks omitted). "The principal factors for such an inquiry are the importance of the witness's wrongly admitted testimony and the overall strength of the

prosecution's case." *United States v. Dukagjini*, 326 F.3d 45, 62 (2d Cir. 2003) (internal quotation marks omitted).

Cummings does not allege that the government presented insufficient evidence to support his conviction. Nor do we dispute the significant amount of evidence presented over the course of Cummings's three-week trial. The jury heard considerable evidence regarding Cummings's guilt of the charged crimes, including eyewitness testimony and confessions regarding the Jones and Copeland murders.

The test of whether an error is harmless, however, is not whether, "disregarding the erroneously introduced evidence, there was other evidence which was independently sufficient to establish [Cummings's] guilt." *United States v. Check*, 582 F.2d 668, 684 (2d Cir. 1978) (internal quotation marks omitted). Rather, we must evaluate the "manner in which, in the total setting of the case, the error influenced the jury." *Id.* (internal quotation marks omitted). Then, "[o]nly if our conviction is sure that the error did not influence the jury or had but very slight effect," will we affirm Cummings's conviction. *Id.* (internal quotation marks omitted). Because of the severely prejudicial nature of Volcy's

death threat testimony, the distinct possibility that the jury would use such testimony as impermissible propensity evidence in the absence of a limiting instruction, and the serious risk that such evidence "'lure[d] the [jury] into declaring guilt on a ground different from proof specific to the offense charged,'" *United States v. Massino*, 546 F.3d 123, 132 (2d Cir. 2008) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)), we are unable to conclude that the admission of such testimony was unimportant in relation to the other evidence considered by the jury. Therefore, we hold that—to the extent that we are not sure that the improper admission of Volcy's hearsay death threat testimony did not influence the jury or that it had very slight effect—the error was not harmless.

Although we neither affirm nor disturb the district court's balancing analysis pursuant to Rule 403, we draw upon similar considerations—probative value, danger of unfair prejudice—in determining the importance of Volcy's wrongly admitted, death threat testimony and whether it substantially influenced the jury. *See* Fed. R. Evid. 403.

"It is hard to deem harmless the erroneous admission of death threat evidence" because death threat evidence may be "toxic." *United States v. Morgan*, 786 F.3d 227, 234 (2d Cir. 2015). "As our past decisions indicate, the potential prejudice for death threats may be great." *United States v. Qamar*, 671 F.2d 732, 736 (2d Cir. 1982). "Ordinarily, unrelated death[] threat testimony is kept from a jury because its potential for causing unfair prejudice outweighs its probative value with respect to a defendant's guilt." *United States v. Panebianco*, 543 F.2d 447, 455 (2d Cir. 1976).

In this case, the admission of Volcy's death threat evidence was toxic for several reasons.

First, the admission of Volcy's death threat testimony created an undue risk that the jury construed the threat as evidence of Cummings's murderous propensity. Propensity evidence, like other evidence that poses a risk of causing unfair prejudice,

> tends to distract the jury from the issues in the case and permits the
> trier of fact to reward the good man and to punish the bad man
> because of their respective characters[,] despite what the evidence in
> the case shows actually happened. The effect in such a case might be
> to arouse the jury's passions to a point where they would act
> irrationally in reaching a verdict.

29

*United States v. Robinson*, 560 F.2d 507, 514 (2d Cir. 1977) (internal quotation marks and citation omitted).

Here, there was an undue "likelihood that the jury would substitute the death threat evidence for consideration of the elements of the charged crimes." *Morgan*, 786 F.3d at 233. The similarity of the threat evidence to the charged crimes may have misled the jury and substantially heightened the potential of the threat evidence to influence the jury. Cummings was on trial for, among other crimes, the shooting and killing of both Jones and Copeland. The similarity between Volcy's death threat testimony and the crimes charged risked suggesting to the jury that it should convict Cummings of the prior murders because he was willing to murder for expedience. Therefore, the death threat evidence had a substantial "capacity . . . to lure the [jury] into declaring guilt on a ground different from proof specific to the offense charged." *Massino*, 546 F.3d at 132. Its erroneous admission raises serious doubts that such evidence was unimportant to the jury in light of the other evidence presented.

Second, the district court did not provide a limiting instruction to the jury about the limited permissible purpose of Volcy's death threat testimony. In the

30

absence of a limiting instruction, there was an undue risk that the jury considered the death threat evidence as evidence of Cummings's murderous propensity rather than as evidence of Cummings's consciousness of guilt.

"Where evidence is admissible for one purpose but is inadmissible for another, the trial judge should, when requested, instruct the jury as to the limited purpose for which the evidence may be considered." *United States v. Washington*, 592 F.2d 680, 681 (2d Cir. 1979); *see* Fed. R. Evid. 105. "[L]imiting instructions are an accepted part of our present trial system." *United States v. Ebner*, 782 F.2d 1120, 1126 (2d Cir. 1986) (internal quotation marks omitted). Limiting instructions serve an important purpose of reducing the danger that a jury, after hearing about a defendant's other crimes or bad acts, "will impermissibly infer that he is a bad man likely to have committed the crime for which he is being tried." *United States v. Benedetto*, 571 F.2d 1246, 1249 (2d Cir. 1978).

As a general matter, a defendant must request such a limiting instruction; if he does not, he waives any objection to the admissibility of the disputed evidence, *see United States v. Smith*, 283 F.2d 760, 764 (2d Cir. 1960), and the district court will typically not be found in error by failing to provide an

31

unrequested instruction, *see Benedetto*, 571 F.2d at 1250 n.9 (finding no plain error in the district court's failure to provide a limiting instruction where no such charge was requested by the defendant).

Although we do not ascribe plain error to the district court for not providing a limiting instruction here where Cummings's defense counsel failed to renew any request for an instruction at the charge conference, *see United States v. Tracy*, 12 F.3d 1186, 1195 (2d Cir. 1993), the absence of such an instruction nevertheless looms large in considering the potential unfair prejudice Cummings suffered as a result of the erroneous admission of Volcy's death threat testimony and the importance of the error to Cummings's trial. For example, in several of our prior cases holding that the admission of death threat testimony was harmless, we pointed to the district court's effective use of limiting instructions to reduce the potential prejudice from the threat evidence. *See, e.g.*, *Qamar*, 671 F.2d at 737 (explaining that the district court "limited the potential prejudice" of death threat testimony "by admonishing the jury" about its few permitted uses); *United States v. DeLillo*, 620 F.2d 939, 946 (2d Cir. 1980) ("[T]he prejudice is likely

to be small because the jury will be instructed not to consider the threat on the question of the defendant's overall guilt").

Recognizing that Volcy's death threat testimony had the potential to cause severe prejudice to Cummings, both parties and the district court acknowledged the value of a limiting instruction in relation to the admission of such evidence. *See* App'x at 56 (government's motion in limine) (noting that the prejudice from death threat testimony was "potentially significant" but stating that such prejudice "will be further eliminated by a limiting instruction"); App'x at 65 (Cummings's opposition to motion in limine) (requesting a limiting instruction if the court decided to admit Volcy's death threat testimony); *Cummings*, 60 F. Supp. 3d at 440 (discussing, in granting the motion in limine, the power of a limiting instruction to reduce the prejudicial effect of Volcy's testimony and stating that such testimony would be admitted "subject to an appropriate limiting instruction"); Proposed Jury Instructions at 33 (requesting an instruction on the permissible use of Rule 404(b) evidence and including an admonishment that the jury may not "consider this [other act] evidence as proof that [Cummings] has a criminal propensity or bad character"). Because the death

33

threat testimony, nevertheless, was admitted without a limiting instruction, the jury may have considered it for any purpose—including an impermissible purpose, such as evidence of Cummings's murderous propensity.

Third, the government's description of Volcy's death threat testimony in its summation went beyond the alleged purpose for its admission (to prove Cummings's consciousness of guilt). In its summation, "the government argued to the jury that the death threats were evidence of [Cummings's] guilt." *Morgan*, 786 F.3d at 235. Specifically, the government stated that such death threat testimony "was in fact completely devastating proof of [Cummings's] crimes." Tr. 2162. The government's statements in summation exacerbated the injurious effect of Volcy's death threat testimony by inviting the jury to consider such testimony for impermissible purposes. In light of this improper description of Volcy's death threat testimony to the jury, "[e]ven if it would otherwise have been proper for the government to argue in its summation that the death threats evinced *consciousness* of guilt, we cannot conclude that the government placed no undue emphasis on the threats." *Morgan*, 786 F.3d at 235 (internal quotation marks omitted).

34

Finally, the hearsay nature of Volcy's death threat testimony unfairly prejudiced Cummings and may have affected the jury's understanding of this testimony. "The hearsay rule is generally said to exclude out-of-court statements offered for the truth of the matter asserted because there are four classes of risk peculiar to this kind of evidence: those of (1) insincerity, (2) faulty perception, (3) faulty memory[,] and (4) faulty narration, each of which decreases the reliability of the inference from the statement made to the conclusion for which it is offered." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 232 (2d Cir. 1999). The rule "ordinarily prohibits the admission of out-of-court statements by declarants on the theory that cross-examination can help test for these four classes of error, thus allowing the [jury] to weigh the evidence properly and to discount any that is too unreliable." *Id.*

In this case, Volcy's death threat testimony presented all of those dangers. For example, did the unknown third-party declarant have an incentive to fabricate Cummings's alleged death threat (insincerity)? Did that third-party declarant actually hear Cummings, as opposed to someone else, make this threat (faulty perception)? Even if the third-party declarant heard Cummings make a

35

threat, was it actually directed to Volcy as opposed to another inmate (faulty memory)? Did the third-party declarant relay the proper message from Cummings's alleged threat (faulty narration)?

Typically, hearsay dangers may be mitigated by cross-examination. *See United States v. Reyes*, 18 F.3d 65, 69 (2d Cir. 1994) ("The principal vice of hearsay evidence is that it offers the opponent no opportunity to cross examine the declarant on the statement that establishes the declared fact."). But because the government neither identified the unknown third-party declarant nor called that person to testify, Cummings was unable to cross-examine that person and challenge the veracity of the death threat evidence. Cummings was therefore denied the opportunity to undermine the trustworthiness of the third-party declarant and to minimize the injurious effect of the death threat evidence.

Because of the toxic nature of death threat testimony, "we have carefully limited [its] use to situations where there was a clear need for the prosecution to use such evidence." *Check*, 582 F.2d at 685. Here, there was no such need. Volcy's death threat testimony "bore no relation to the offenses for which [Cummings] was being tried." *Morgan*, 786 F.3d at 232, nor was it "inextricably intertwined

36

with the evidence regarding the charged offense," *United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007). It was not evidence of Cummings's participation in the narcotics conspiracy, murders, or firearms violations. *See Tracy*, 12 F.3d at 1195 (finding no abuse of discretion in admitting death threat testimony where the testimony showed that defendant "was a member of the conspiracy and played a role that gave him . . . familiarity with [its] operation"). Nor was such testimony offered as evidence regarding a witness's credibility. *See Qamar*, 671 F.2d at 736 (finding no abuse of discretion in the admission of threat evidence when such evidence was useful to explain a witness's demeanor, whose credibility "was central to the jury's determination of guilt or innocence"); *Panebianco*, 543 F.2d at 455. Because Volcy's death threat testimony was unconnected to the charged crimes, it is dubious that there was a "clear need" for Volcy's death threat testimony and that it "serve[d] an important purpose." *See Morgan*, 786 F.3d at 229.

Moreover, the government presented other, far more damning, evidence of Cummings's consciousness of guilt: his confessions. In light of the extensive

testimony regarding these confessions, Volcy's death threat testimony was little more than gratuitous.

In opposition to Cummings's claim, the government argues that Volcy's death threat testimony was not unfairly prejudicial because Cummings's verbal threat "paled in comparison to the crimes which Cummings was charged, including two premeditated, assassination-style murders." Appellee's Br. at 23. While we acknowledge that the prejudicial effect of evidence is mitigated where the evidence is no "more sensational or disturbing than the crimes with which [the defendant] [i]s charged," *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990), we are not persuaded that this rule trumps the other sources of unfair prejudice present in the instant case that made Volcy's death threat toxic.

Additionally, the government claims that Volcy's death threat testimony was not prejudicial and was therefore harmless because such testimony "was several lines in a trial transcript that is approximately 2,000 pages." Appellee's Br. at 25. We are not persuaded.

Unquestionably, when determining whether the erroneous admission of evidence was harmless, we consider the centrality of that evidence at trial and

the number and frequency of references to the wrongly admitted evidence. *See*

*e.g.*, *Morgan*, 786 F.3d at 234 ("Here, the death threat evidence was the

government's most dramatic evidence at trial, a circumstance that weighs in

favor of ruling that the error affected Morgan's substantial rights." (internal

quotation marks and brackets omitted)); *United States v. McDermott*, 277 F.3d 240,

243 (2d Cir. 2002) (holding that references to disputed evidence was harmless in

light of the limited number of references and the substantial evidence against the

defendant). But these considerations are not dispositive in this case. Although

the references to Volcy's death threat testimony were few and the testimony was

not a central piece of evidence in the case, Volcy's death threat testimony still

carried significant risk of substantially influencing the jury because it had the

tendency to "distract the jury from the issues in the case," *Morgan*, 786 F.3d at

233, and to "permit[] the trier of fact to . . . punish the bad man because of [his] []

character[]," *Robinson*, 560 F.2d at 514. We have acknowledged the toxic effects of

improperly admitting death threat testimony, *see, e.g.*, *Morgan*, 786 F.3d at 234;

*Qamar*, 671 F.2d at 736-37; *Panebianco*, 543 F.2d at 455; *Check*, 582 F.2d at 685-86,

and we are not persuaded that it was unimportant to the jury despite by the

39

limited number of references to Volcy's death threat testimony and the volume of other evidence in this case.

It is not the province of this Court to "speculate upon probable reconviction and decide according to how the speculation comes out." *Kotteakos v. United States*, 328 U.S. 750, 763 (1946). *United States v. Tussa*, 816 F.2d 58, 67 (2d Cir. 1987) ("Even if an appellate court is without doubt that a defendant is guilty, there must be a reversal if the error is sufficiently serious."). "But this does not mean that the appellate court can escape altogether taking account of the outcome." *Kotteakos*, 328 U.S. at 764. Rather, we must "take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened." *Id.*

Accordingly, after an examination of the record, we are unable to conclude with fair assurance that the evidence did not substantially influence the jury. Therefore, we hold that, in light of the facts of this case, the erroneous admission of the death threat evidence was not harmless.

# CONCLUSION

Despite the seriousness of the crimes charged against Cummings, in light of the erroneous admission of hearsay death threat testimony, and the harmfulness of that error, we vacate Cummings's conviction and remand for a new trial.